# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### June 5, 2018 Session

## GEORGE FRANKLIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 02-08108, 02-08109      Chris Craft, Judge**

_____

### No. W2017-01174-CCA-R3-PC

_____

The Petitioner, George Franklin, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his convictions of one count of second degree murder and nine counts of attempted second degree murder and resulting effective sentence of 102 years in confinement. On appeal, the Petitioner contends that his trial counsel was ineffective at sentencing and that the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose a witness's statement. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, J., joined. ROBERT W. WEDEMEYER, J., filed a concurring and dissenting opinion.

Michael R. Working, Memphis, Tennessee, for the appellant, George Franklin.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

This case arose from a drug deal in which a three-year-old girl was shot and killed and nine other people, including two young children and three teenagers, also were shot. In October 2002, the Shelby County Grand Jury indicted the Petitioner and two codefendants for one count of first degree premeditated murder and nine counts of

attempted first degree premeditated murder. In December 2002, the State filed notice of intent to seek the death penalty.

The Petitioner was tried separately from his codefendants. On direct appeal of his convictions, this court summarized the proof at trial as follows:

The events surrounding the death of Jessica [Borner] and the injury to the other victims occurred on June 12, 2002 at 3448 Rosamond in Memphis. The incident was the result of a drug transaction. That day several people were "hanging out" in the front yard of the house. Sometime in the early afternoon, Chris Burnett, who was in the yard, decided he wanted to buy a bag of marijuana. Another person present in the yard, Antonio Hawthorne, knew [the Petitioner] dealt drugs and called [the Petitioner] for Mr. Burnett. [The Petitioner] came to the home on Rosamond and sold a ten dollar bag of marijuana to Mr. Burnett sometime in the early afternoon hours. [The Petitioner] then left the premises. About ten minutes later, the group of adults in the yard determined that the marijuana was "no good," and [the Petitioner] was called to return and give Mr. Burnett his money back. [The Petitioner] came back to the house and took the marijuana and returned Mr. Burnett's ten dollars.

There was differing testimony as to what occurred when [the Petitioner] returned to give the money back. According to the State's witnesses, [the Petitioner] was angry and yelling obscenities. Ms. Helen Hobbs, who lived at 3448 Rosamond, testified that she told Tyrone Taylor who was present in the yard and [the Petitioner] to "get out of my yard with the arguing." Ms. Hobbs testified that she did not hear anymore shouting after she said this. Dennis Taylor testified that [the Petitioner] returned with "an attitude." Mr. Calvin Reed, who was also present in the yard, testified that Tyrone Taylor and [the Petitioner] got into a "big argument." [The Petitioner] testified that he was not angry that Mr. Burnett wanted his money back but that Tyrone Taylor still acted aggressively towards him. [The Petitioner] stated that Tyrone Taylor yelled at him even after he walked away. Tyrone Taylor testified that he heard [the Petitioner] say he would return to the house when he was leaving. Derek Borner, the eleven-year-old brother of Jessica, testified that he heard Tyrone Taylor, Chris Burnett, and [the Petitioner] arguing in the front yard. Mr. Borner testified that he told Ms. Hobbs about the argument and then stood behind her in the doorway. The argument continued and Mr. Borner saw Tyrone Taylor take off his shirt like "he was getting ready to fight." [The Petitioner] then said he was leaving but that he would come back.

Chris Burnett testified that [the Petitioner] was "cool" to him and was not angry when he returned to give back the money. Mr. Burnett stated that Tyrone Taylor was angry and that both men were "talking shit" to each other. Mr. Burnett testified that he did not see [the Petitioner] shoot when he came to the house the third time because he was on the ground trying to avoid the shooting. Mr. Burnett further stated that [the Petitioner] never threatened him.

[The Petitioner] testified that after he left the house, he received a "few" phone calls from Tyrone Taylor. [The Petitioner] stated that Tyrone Taylor was threatening him and that he hung up on him. Shortly thereafter, [the Petitioner] received a phone call from a friend, Rico. Rico told [the Petitioner] that Tyrone Taylor wanted to "talk" and that [the Petitioner] should go back to the house. [The Petitioner] testified that he feared what Tyrone Taylor would do to him if they ran into each other on the streets so he decided to go talk to him. As [the Petitioner] drove around the neighborhood, he noticed his cousin's car. [The Petitioner] testified that he got into the car with his cousin, Leslie Franklin, and Mack Jones and that they smoked for a short period of time. [The Petitioner] and his two friends then drove to the house on Rosamond in Mr. Franklin's car. When they arrived, they did not park in front of the house where the drug transaction had occurred earlier because [the Petitioner] knew that house was a "hot" spot that the police watched.

According to the State's witnesses, [the Petitioner], Leslie Franklin, and Mr. Jones got out of the car with their guns drawn. [The Petitioner] had in his possession a nine millimeter handgun and his two friends each had an assault rifle. Tyrone Taylor testified that he asked [the Petitioner] what he was going to do and that [the Petitioner] "started shooting." Tyrone Taylor stated that [the Petitioner] aimed at him and was the first of the three men to start shooting. Tyrone Taylor was shot in the arm.

[The Petitioner] admitted that he wanted his cousin and Mr. Jones to accompany him because he did not feel safe going back to Rosamond alone. [The Petitioner] stated that this was because he knew that Tyrone Taylor, Antonio Hawthorne, Calvin Reed, and Dennis Taylor were members of the gang known as the Crips. [The Petitioner] testified that after Tyrone Taylor threatened him he was scared, but he feared running into him on the street more than if he went to the house to talk to him.

- 3 -

[The Petitioner] testified that when he arrived at Rosamond he parked down the street and exited the car. Tyrone Taylor was walking towards him and they exchanged "what's up." Then, according to [the Petitioner], Tyrone Taylor reached for his gun and pointed it at [the Petitioner]. [The Petitioner] stated that while he and Tyrone Taylor were greeting each other he heard the other car doors open and he assumed Mr. Jones and Leslie Franklin had exited the car. Tyrone Taylor fired a shot and [the Petitioner] said he "was ducking." After that shot was fired, [the Petitioner] testified there were "shots coming in front of me and behind me [from Mr. Jones and Leslie Franklin]." Although [the Petitioner] testified that he always carries a gun and on that day was carrying a nine millimeter, he said he never drew his gun. Despite the fact that [the Petitioner] testified that he never drew his gun, several of the State's witnesses testified that they saw that he was carrying a nine millimeter handgun. Tyrone Taylor testified that [the Petitioner] shot him in the arm. However, the crime scene investigator, Ricky Davison, testified that no nine millimeter casings were found at the scene.

Tyrone Taylor testified that [the Petitioner], Leslie Franklin, and Mr. Jones "started shooting straight in the house." [The Petitioner] denied that he ever fired his weapon. [The Petitioner] also stated that he did not know there were children in the house. There were, however, several children in the house that day. There were three-year-old Jessica, four-year-old Lloyd Banks, Jr., ten-year-old Michael Owens, eleven-year-old Derek Borner, and teenagers Nequeshia Hobbs, Shaquesha Hobbs, and Sherry Hobbs. Lloyd was shot in the shoulder. A bullet grazed Michael's shoulder. Derek was not injured in the incident. Nequeshia was shot in the finger, Shaquesha in the leg, and Sherry was shot in the right breast.

Many of the adults testified to the chaos during the incident and damage that occurred to the house. Dennis Taylor testified that he heard more than forty shots fired in the house. Mr. Hawthorne said he heard "many shots." Sandra Hawthorne testified that she heard "a whole lot of shots" and was shot in the back. Ms. Hobbs testified she told the children to "lay down . . . someone's shooting." Ms. Hobbs was shot in her arm, chest, knee, toe, and three places on her side. Several police officers testified that the damage to the house and the crime scene in general was one of the worst they had ever seen.

J.C. Fair, who was present at the house that day, testified for the defense. Mr. Fair testified that when [the Petitioner] returned to give back

- 4 -

the money he was calm and that Tyrone Taylor was aggressive. Mr. Fair also testified that Tyrone Taylor had a gun in his waistband on the day the incident occurred.

Dr. O'Brian Smith testified that Jessica died as a result of a high velocity gunshot wound to the chest and abdomen. He further testified that a high velocity gun is a gun like an assault rifle, while a low velocity gun is a gun like a nine-millimeter.

State v. George Franklin, W2006-01204-CCA-R3-CD, 2008 WL 4613876, at *1-3 (Tenn. Crim. App. at Jackson, Oct. 15, 2008), perm. app. denied, (Tenn. Mar. 16, 2009).

At the conclusion of the proof, the jury found the Petitioner criminally responsible for the second degree murder of Jessica Borner and the attempted second degree murders of Chris Burnett, Tyrone Taylor, Lloyd Banks, Michael Owens, Sherry Hobbs, Nequeshia Hobbs, Sandra Hawthorne, Helen Hobbs, and Shaquesha Hobbs. Id. at *3. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to consecutive sentences of twenty-five years for the second degree murder conviction and twelve years for each attempted second degree murder conviction for a total effective sentence of 133 years. Id.

Subsequently, this court affirmed the Petitioner's convictions but concluded that the trial court improperly enhanced his sentences pursuant to State v. Gomez, 239 S.W.3d 733, 739-40 (Tenn. 2007), also known as Gomez II. Accordingly, this court modified his sentences from twenty-five years to twenty-one years for the conviction of second degree murder and from twelve years to nine years for each of the nine convictions of attempted second degree murder for a total effective sentence of 102 years. Id. at *9.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a pro se petition for post-conviction relief. The State responded with a motion to dismiss the petition as untimely, and the post-conviction court entered an order dismissing the petition without the appointment of counsel or an evidentiary hearing on the basis that it was barred by the one-year statute of limitations. On appeal, this court reversed the ruling of the post-conviction court and remanded for that court's consideration of the petition on the merits. George Franklin v. State, No. W2010-01327-CCA-R3-PC, 2011 WL 1118482 (Tenn. Crim. App. at Jackson, March 15, 2011), perm. app. denied, (Tenn. July 14, 2011).

The post-conviction court heard evidence on December 19, 2013, April 10, 2014, September 19, 2014, May 1, 2015, July 31, 2015, and November 12, 2015. During the hearings, the Petitioner focused his evidence on two main issues. First, he argued that

- 5 -

trial counsel was ineffective at sentencing for not presenting the proof the defense had prepared for the sentencing phase of the trial, which never occurred because the jury convicted him of the lesser-included offense of second degree murder. He also argued that the State improperly withheld the statement of Patryck Canard, who lived in the home directly behind the Rosamond house.

Relevant to his appeal, Glori Shettles testified for the Petitioner that she was a mitigation specialist and had worked on about one hundred capital cases. She explained that a mitigation specialist prepared a personal history for a capital case defendant in order to lessen the chance of the defendant's being sentenced to death. Ms. Shettles said she worked on the Petitioner's case for several years until "the death penalty was dropped by the State."

Ms. Shettles testified that mitigation in a capital case was different from a noncapital case in that the jury made the sentencing determination but that the mitigating factors in both cases were similar. She explained that a mitigation investigation started with the defendant and then moved to witnesses, family, and other people who had information relevant to the mitigating factors and, in turn, the case. In the instant case, she spoke with five to ten witnesses and found the Petitioner to be a "very cooperative client." The Petitioner had a very large extended family, his family members also were cooperative, and several of them planned to testify on his behalf in mitigation. Ms. Shettles said she herself had testified in previous cases.

Ms. Shettles identified some CDs that she made for the Petitioner's mitigation. One was a Powerpoint demonstration of his life history. Another included a presentation reflecting statutory and non-statutory mitigating factors the jury could consider. Ms. Shettles identified her 600-page file, and she noted evidence that supported several of the mitigating factors applicable in noncapital cases. She acknowledged that there was support for the following: the Petitioner did not have a significant criminal history, especially considering the environment in which he was raised; the crimes were committed while the Petitioner was under the influence of a self-defense or duress-type of mental disturbance; the victims participated in the Petitioner's conduct in that this was a "shoot-out" situation; the crimes were committed under circumstances in which the Petitioner reasonably believed there was a moral justification; the Petitioner was an accomplice in that he was not the actual shooter; the Petitioner cooperated with authorities and showed remorse; the Petitioner's conduct in jail was exemplary; and the Petitioner had a solid work history.

On cross-examination, Ms. Shettles testified that she thought the State withdrew its notice to seek the death penalty weeks before the Petitioner went to trial. The information she had gathered "was put in a box," and trial counsel did not use the

information at sentencing. At that point in her testimony, post-conviction counsel handed Ms. Shettles a list of mitigating factors for noncapital cases and asked whether any of them were relevant to the Petitioner. She stated that trial counsel could have argued that the Petitioner acted under strong provocation, that he played a "lesser" role in committing the crimes, and that he acted under duress. She acknowledged that she did not know whether trial counsel raised any of those mitigating factors at sentencing.

On redirect examination, Ms. Shettles acknowledged that the Petitioner's exemplary jail behavior, history of employment, and remorse would have been relevant at sentencing under the catch-all mitigating factor. She also acknowledged that she could have testified at sentencing about his work history, remorse, and the programs he had completed while incarcerated.

Following Ms. Shettles's testimony, the post-conviction court clarified that the State did not withdraw its intention to seek the death penalty before trial. Instead, the jury convicted the Petitioner of the lesser-included offense of second degree murder, so the death penalty was no longer available.

The Petitioner testified that he had received only one sanction during his eleven- and one-half years of incarceration. He received his GED and completed twenty-five programs, seventeen of them before trial, while in confinement. They included classes on anger management, stopping violence, DUI, a commitment to change, and religious studies.

The Petitioner testified that lead counsel visited him in jail and prepared him to testify at trial and sentencing. Lead counsel also gave him a copy of the applicable mitigating factors. At the time of the shooting, the Petitioner was employed by Memphis City Schools and BFI, a trash collection service. The Petitioner said he worked his entire adult life before the shooting, being employed at times at a restaurant and a fast food establishment. The Petitioner said he had never been fired from a job and only left one position for a better position.

Co-counsel testified that he became involved in the Petitioner's case "late in the game." Lead counsel was responsible for the guilt phase of the trial, and co-counsel was to handle the mitigation phase. The Petitioner was entitled to two attorneys because he was facing the death penalty, and co-counsel worked with Ms. Shettles on the mitigation investigation. Co-counsel recalled that if the jury had found the Petitioner guilty of first degree murder, co-counsel would have been responsible for offering mitigating evidence at sentencing, something he had done in other capital cases. His main witness was going to be Ms. Shettles. However, when the jury returned a verdict of second degree murder, the Petitioner was no longer entitled to two attorneys "by operation of law," so the trial

court immediately relieved co-counsel from further representation.

Co-counsel acknowledged that a "substantial" amount of mitigation proof was acquired in this case. He said that the Petitioner came from "a really good family," which "cut both ways" in mitigation. Specifically, the defense could have argued at sentencing that the Petitioner's behavior on the day of the shooting was out of character for him; on the other hand, he "came from an upbringing where it wasn't maybe as bad as [other death penalty defendants]." Also in mitigation, co-counsel recalled that the proof showed the Petitioner was not the shooter. Co-counsel wanted to introduce evidence at sentencing that one of the victims, Tyrone Taylor, had a prior record and ripped off his shirt. Mr. Taylor yelled, confronted, and threatened the Petitioner, and the situation was volatile. Moreover, the Petitioner did not have a criminal record, had a good work history, and was educated.

On cross-examination, co-counsel acknowledged that lead counsel was present each time co-counsel met with Ms. Shettles. He also acknowledged that he and lead counsel shared one case file and that lead counsel had access to all of the mitigation evidence contained in the file.

Lead counsel testified that when he first began representing the Petitioner, lead counsel's sister, also an attorney, was the Petitioner's original co-counsel. She was appointed to be a judge, so lead counsel asked co-counsel to assist with the case. Lead counsel said that he was more responsible for the guilt phase of the Petitioner's trial and that "if we get to a Sentencing Hearing, [co-counsel] would be responsible more for that." Ms. Shettles "did the mitigation investigation," and Ms. Shettles and co-counsel were prepared to offer mitigating evidence. Lead counsel said he "imagin[ed]" the trial court "relieved" them after the jury's verdict, which was "a common practice back then." Lead counsel said he did not recall filing a list of mitigating factors or a motion opposing the State's notice of enhancement factors after the jury's verdict. He said that if he did not file anything, he "probably should have."

Lead counsel testified that the Petitioner was one of his favorite clients because the Petitioner was "easy to get along with," nice, and had a nice family. Lead counsel recalled that the Petitioner always had a smile on his face, was loyal to his cousins, asked questions, and never got angry. One of the reasons for having the Petitioner testify at trial was that he was "very, very, likeable." Lead counsel said he thought the Petitioner's codefendants each pled guilty in exchange for a twenty-year sentence.[1] The only offer

---

[1] Lead counsel was mistaken in that one of the Petitioner's codefendants went to trial, was convicted of one count of first degree murder and nine counts of attempted first degree murder, and received an effective life sentence. State v. Mack Tremaine Jones, No. W2005-00014-CCA-R3CD, 2007 WL 1840798 (Tenn. Crim. App. at Jackson, June 27, 2007), perm. app. denied, (Tenn. Oct. 15, 2007).

- 8 -

the State made to the Petitioner was life without parole.

Lead counsel testified that the theory of the case was "multi-faceted" but that his first priority was to "avoid the death penalty at all costs." The Petitioner and his codefendants returned to the house to "talk it out," but, for whatever reason, the Petitioner's codefendants took assault rifles with them. The Petitioner "lost control of the situation and before he was able to do anything, gunshots begin to erupt and then he was unable to stop it." Lead counsel said that the Petitioner did not plan or intend for a shoot-out to occur before he returned to the home and that lead counsel argued self-defense because the Petitioner and his codefendants were not the first to fire guns but were fired upon by someone inside the residence. Lead counsel acknowledged that the trial court did not instruct the jury on self-defense despite his request for an instruction.

Lead counsel testified that the Petitioner was indicted in 2002 and that the Sentencing Act changed in 2005. In 2006, the trial court sentenced the Petitioner under the 1989 Sentencing Act. Lead counsel said he did not recall whether he and the Petitioner discussed the Petitioner's option to be sentenced under the 2005 Act rather than the 1989 Act. Lead counsel acknowledged that the Petitioner did not testify at sentencing. He stated that the Petitioner "said everything in the guilt/innocence [phase] that he should have and needed to" and that the trial court "remembered it" at sentencing. Lead counsel said he liked for his clients to testify at sentencing if they were willing to take responsibility and express remorse. In this case, though, he did not think he could get the Petitioner "to that point" because the Petitioner "honestly felt justified in a lot of what happened that he did in self-defense." Lead counsel said that he had a difficult time arguing that the codefendants were more culpable than the Petitioner because they were the Petitioner's cousins and the Petitioner was very loyal to them. Therefore, lead counsel focused on the Petitioner's inaction rather than blame the codefendants.

Desmond Hunt testified that he and the Petitioner became friends in 1992. Mr. Hunt was sixteen years old at that time. The Petitioner's mother practically raised Mr. Hunt, and the Petitioner was like a brother to him. Mr. Hunt and the Petitioner spent a lot of time together, and everyone liked the Petitioner. Mr. Hunt described the Petitioner's reputation, saying that the Petitioner did not pose a threat or harm to anyone. One time when Mr. Hunt was involved in a fight, the Petitioner peacefully diffused the situation. The Petitioner was not known as a violent person, and Mr. Hunt never saw him with a firearm. Mr. Hunt described the Petitioner as having a "positive influence" on people and "peaceful" and said that he never knew the Petitioner to instigate an act of violence or have a quick temper.

Mr. Hunt testified that he spoke with the Petitioner after Jessica Borner's death and that the Petitioner was "extremely remorseful" and "in tears." The Petitioner was a

government employee and had a good job. Mr. Hunt was not called to testify at the Petitioner's sentencing hearing. Given the opportunity, he would have "gladly" done so. On cross-examination, Mr. Hunt testified that he would be surprised to learn the Petitioner testified at trial that the Petitioner always carried a gun.

Desmond Merriweather testified that he had known the Petitioner "my whole life." Although they were not biologically related, they had a close relationship, and the Petitioner was like a brother to Mr. Merriweather and a father figure to Mr. Merriweather's son. At the time of the shooting, Mr. Merriweather's son was about the same age as Jessica Borner. The Petitioner was helping Mr. Merriweather raise his son because Mr. Merriweather was attending Lane College in Jackson, about ninety minutes from his child's home in Memphis. Mr. Merriweather was playing basketball for the college and living there, and the Petitioner helped Mr. Merriweather financially.

Mr. Merriweather testified that "right before" the shooting, the Petitioner came to watch and support him in a basketball game. The Petitioner was acting normal and was caring, carefree, and happy. Mr. Merriweather introduced the Petitioner to all his friends, and they all "took a liking to him."

Mr. Merriweather testified that he visited the Petitioner in jail after the shooting and that the Petitioner was "deeply saddened because this affected our whole community. . . . And he's like a role model in the community." Mr. Merriweather said that the Petitioner had a job with the school system and that he never knew the Petitioner to be violent. He said that he would have testified at sentencing on the Petitioner's behalf. On cross-examination, Mr. Merriweather acknowledged that he did not know the Petitioner was "dealing" drugs in the community.

Angela Collins testified that she had been friends with the Petitioner's mother for more than thirty years and that she had known the Petitioner most of his life. The Petitioner was a "good little boy" and did not get into trouble. The Petitioner's mother raised him in the church, and he was playful and helpful to others, including Ms. Collins's mother. Ms. Collins never knew him to be violent. She said that she visited him after his arrest, that he was "wagging his head and crying," and that he was very remorseful. The Petitioner was employed and had a reputation as a good person, and Ms. Collins would have testified on his behalf at sentencing. On cross-examination, Ms. Collins testified that she did not know the Petitioner carried a firearm or sold drugs.

Leslie Franklin, the Petitioner's cousin, testified that the Petitioner's mother raised them as brothers. Mr. Franklin and Mack Jones were the Petitioner's codefendants in this case. The State tried Mr. Jones first, and Mr. Franklin pled guilty in exchange for a twenty-five-year sentence about one year before the Petitioner's trial. The plea

agreement required that Mr. Franklin testify against the Petitioner. Mr. Franklin did not recall the Petitioner's attorney being present at Mr. Franklin's plea hearing. During the plea hearing, the State asked Mr. Franklin under oath if the Petitioner fired a gun during the shooting, and Mr. Franklin answered no. Mr. Franklin said the State never talked with him again and did not call him to testify at the Petitioner's trial.

Mr. Franklin testified that if the State had called him as a witness at trial, he would have said that on the day of this incident, the Petitioner sold a small amount of marijuana to Tyrone Taylor. Mr. Taylor decided he wanted his money back. A mutual friend of the parties, Nikita "Rico" Crawford, attempted to get the two groups together to discuss the situation. Mr. Crawford telephoned Mr. Franklin and suggested that he bring the Petitioner to Mr. Taylor's house to diffuse the situation.

Mr. Franklin testified that he agreed it was a good idea to resolve the issue peacefully. Therefore, after speaking with Mr. Crawford, he went and found the Petitioner. The plan was for them to meet Mr. Crawford at Mr. Taylor's house. Mr. Franklin asked the Petitioner to drive because the Petitioner had a valid driver's license but Mr. Franklin did not. The Petitioner drove to Mr. Taylor's house with Mr. Franklin sitting in the front passenger seat and Mr. Jones sitting in the backseat behind the Petitioner. Mr. Franklin said that the Petitioner did not ask him for help that day and that they returned to Mr. Taylor's house based upon advice from Mr. Crawford.

Mr. Franklin testified that as they pulled up to Mr. Taylor's house, someone handed Mr. Taylor a handgun, and Mr. Taylor fired toward the car. Mr. Franklin returned fire with an assault rifle he had on the front seat. He acknowledged that the situation then turned into a "shoot-out." He said that he did not know whether the Petitioner even exited the car and that he never saw the Petitioner with a weapon.

Mr. Franklin testified that he acted in self-defense because Mr. Taylor shot at him and the Petitioner. He said he brought the assault rifle with him because Mr. Taylor was a known gang member, Mr. Taylor's house was a known drug house, and Mr. Crawford had told Mr. Franklin that previous situations had "got out of hand" there. Mr. Franklin said the leader of setting up the meeting that day was Mr. Crawford.

On cross-examination, Mr. Franklin testified that as soon as Mr. Taylor fired the first gunshot, Mr. Franklin got his assault rifle, stood up beside the car, and shot back. Mr. Jones also had an assault rifle, but Mr. Franklin did not know whether Mr. Jones fired it. Mr. Franklin said he knew the Petitioner did not fire a weapon because there were only two assault weapons at the scene, and Mr. Franklin and Mr. Jones possessed them. Mr. Franklin did not see the Petitioner with a firearm. He acknowledged that the Petitioner was behind him during the shooting but maintained that the Petitioner did not

fire a gun.

On redirect examination, Mr. Franklin testified that he was not present when the Petitioner returned the money to Mr. Taylor. As the Petitioner was driving to Mr. Taylor's house, the Petitioner did not appear angry or agitated. The Petitioner and Mr. Taylor did not argue about money before the shooting.

Rachel Geiser testified that she was the fact investigator for the Petitioner's case. Co-counsel and Ms. Shettles were in charge of the mitigation evidence while Ms. Geiser and lead counsel worked on the guilt phase. Ms. Geiser spoke with multiple witnesses during her investigation, and many of them gave her information that was helpful to the Petitioner. Ms. Geiser acknowledged that the Petitioner received a "very favorable verdict" from the jury. After the verdicts, Ms. Geiser did not have any further interaction with the case.

Paula Skahan testified that originally, she was the Petitioner's lead trial counsel. She requested discovery and retained an investigator and a mitigation specialist. Ms. Skahan gave the investigator a copy of all of discovery she received.

Erica Bell testified that she was the office manager for post-conviction counsel's law firm and that she reviewed the prosecutor's discovery in this case. She made copies of anything she thought was relevant, including Patryck Canard's statement. She also reviewed trial counsel's file and discovered that Mr. Canard's statement was not in it.

Rachel Geiser was recalled to the stand and further testified that she was familiar with the name "Patryck Canard." Ms. Geiser visited the home on Rosamond during her investigation. She said that the home was slightly above ground level so that a person had to walk up three steps to get to the front door and that "there were several bullets in the house that were raised up to the ceiling area, on the walls." However, Jessica Borner, a young child, was very short. The defense had two theories in this case. First, that the Petitioner did not plan to shoot anyone that day and was not involved in shooting a weapon. The second theory was that "one of the individuals from the house may have been the person who initiated the shooting and, in fact, shot Jessica Borner."

Ms. Geiser testified that the backyard of the Rosamond home adjoined the backyard of a home on the next street, Farmville. Tyrone Taylor allegedly escaped from the back of the home on Rosamond and ran north toward Farmville. However, the defense did not have any proof of that allegation. Ms. Geiser said such evidence would have been important to show that Mr. Taylor may have been shooting through the Rosamond house as he was escaping and may have shot Jessica Borner.

Ms. Geiser identified her 250-page trial notebook and testified that the notebook included a list of all potential witnesses, including Patryck Canard, but that she was unable to obtain a statement from him during her investigation. Ms. Geiser said that her notes contained a memo regarding Mr. Canard's Cadillac Fleetwood. The memo stated that the driver of the vehicle, Mr. Canard, was involved in a homicide investigation and that the vehicle should be released to him without charge. Ms. Geiser said she tried to find Mr. Canard and speak with him at least four times over the three years she worked on the Petitioner's case. However, she never located him.

On cross-examination, Ms. Geiser testified that Mr. Canard's statement was not in her file. According to the statement, which she was able to read the day before her testimony, Tyrone Taylor showed up at a house on Farmville after the shooting and told Mr. Canard he had been shot. Ms. Geiser said the statement was important because "it would show that, in fact, Tyrone did probably exit through the backyard," and she acknowledged that the statement supported the defense's theory that he fired the shot that struck Jessica Borner. Ms. Geiser said that if she had been able to locate Mr. Canard, she would have asked him a "slew" of questions about what Mr. Taylor said happened at the Rosamond house.

Erica Bell was recalled to the stand. She testified that she found Mr. Canard's statement in the State's file when she was allowed to review the file for the post-conviction proceedings.

Khadija Jackson testified that she was post-conviction counsel's secretary. Ms. Jackson "went through" three boxes of documents from the Petitioner's file, looking for affidavits or statements made by Patryck Canard. Ms. Jackson searched "meticulously" and found the name "Patryck Canard" on the Petitioner's indictment. However, she did not find any statements by Mr. Canard.

Lead counsel was recalled to testify and said that Tyrone Taylor was one of the State's "key" witnesses at trial because he was the man who argued with the Petitioner about the bag of marijuana. Lead counsel said that Mr. Taylor was a gang member and that "I'd be shocked if the jury liked hm." Mr. Taylor "didn't appear always very truthful" and was evasive at trial. He did not appear to take the trial proceedings seriously, and lead counsel acknowledged that he was a "combative" witness. The home where the shooting occurred was known for shootings, gambling, and violence, and the police were called there "all the time." Therefore, in addition to the theory of self-defense, lead counsel contended at trial that the adults were engaging in dangerous activities in the home but did nothing to protect the children.

Post-conviction counsel showed Mr. Canard's statement to lead counsel and asked

- 13 -

if lead counsel recognized it. Lead counsel answered, "I'd be lying if I said I did but that was a long time ago." At that point, lead counsel read Mr. Canard's statement to himself. He described the statement as "a pretty bare bone statement" and said that Mr. Canard should have been interviewed "to see whether Mr. Taylor said anything, . . . did he have a gun, was there anything else, anything." Lead counsel said that his investigators were "pretty thorough" and "followed every lead" but that he did not remember having any information about where Mr. Taylor went after the shooting. Lead counsel said that if he had had Mr. Carnard's statement, he would have sent his investigators to interview Mr. Canard and Timothy Williams, the man who lived in the home on Farmville. Mr. Carnard and Mr. Williams may have provided useful information to the defense.

On cross-examination, lead counsel testified that during his closing argument, he contended that the three defendants did not fire the fatal shot; that if they did fire the fatal shot, it struck the wrong person; and that the incident was "brought on" by the people in the house. Lead counsel did not remember ever having any evidence that someone in the back of the house fired a weapon. Mr. Taylor testified at trial that he jumped out a back window and ran. Therefore, the defense was aware of that evidence during the trial, and Mr. Carnard's statement would not have been particularly helpful. Mr. Taylor also testified at trial that he was unarmed. Lead counsel did not think the jurors could have believed him, though, "based on his character." Lead counsel said he did not contend during his closing argument that Mr. Taylor could have shot Jessica Borner with a nine-millimeter handgun as he was leaving the home because "I don't believe the ballistics were favorable to us. I think this child had like a large hole that would not have come from a handgun." Lead counsel's original file in this case was destroyed by a flood, and he did not have "any independent knowledge either way" as to whether Mr. Carnard's statement was disclosed to the defense. Regardless, he did not think the statement would have helped the defense obtain more favorable verdicts.

On redirect examination, lead counsel testified that he always gave a copy of his discovery materials to his investigators. Although Mr. Taylor testified at trial that he jumped out of the window, the defense had no evidence to support that claim. Therefore, the defense had no evidence to support a theory that a person inside the house shot Jessica Borner. At the conclusion of lead counsel's testimony, the Petitioner rested his proof.

James Robert Carter, Jr., testified for the State that he was one of the prosecutors assigned to the Petitioner's case. He said that he was unsure whether he practiced "open file" discovery at that time but that he "always erred on the side" of giving the defense all information. Furthermore, this case was "unique" because the Petitioner's codefendant was tried and convicted before the Petitioner went to trial. Therefore, the defense was as knowledgeable about the case as the prosecutors.

Mr. Carter testified that the Petitioner's case involved a dispute over a small quantity of marijuana, and Tyrone Taylor was "one of the central figures." Mr. Taylor and the Petitioner argued about whether the money for the marijuana should be refunded, and the Petitioner left Mr. Taylor's home. Shortly thereafter, the Petitioner returned with his two codefendants, and the shooting occurred. Mr. Carter said he did not have a specific recollection about withholding Mr. Canard's statement from the defense. He stated that "I'm sure we provided the name of Mr. Canard, probably provided the statement" but that he could not say for sure.

On cross-examination, Mr. Carter agreed that Mr. Canard was listed on the indictment and that his car was impounded after the shooting. Mr. Carter did not know if the car was impounded because, as Mr. Canard said in his statement, Mr. Taylor asked Mr. Canard to drive to the Rosamond home, pick up J.C. Fair from the home, and tell Mr. Fair that Mr. Taylor needed medical treatment. Mr. Carter said eleven adults suffered minor injuries during the shooting. Therefore, a lot of witnesses and police officers were involved in the investigation.

Based upon the foregoing evidence and the arguments of counsel, the post-conviction court denied the petition for post-conviction relief. The Petitioner appeals the ruling of the post-conviction court.

## II. Analysis

### A. Ineffective Assistance of Counsel

The Petitioner contends that lead counsel was deficient at sentencing because lead counsel was unprepared, did not offer mitigating evidence, and did not effectively challenge enhancement factors or consecutive sentencing. The Petitioner specifically takes issue with lead counsel's failure to: (1) file a written application for mitigating factors; (2) call Ms. Shettles to testify at sentencing when she had investigated his case specifically for sentencing; or (3) call a single witness to testify in support of any mitigating factors. The Petitioner also contends that prejudice should be presumed in this case pursuant to United States v. Cronic, 466 U.S. 648, 658-60 (1984), because some members of his defense team "quit" before sentencing and lead counsel "abandoned" him at the sentencing hearing. The State argues that lead counsel provided effective assistance at sentencing. We conclude that the Petitioner has failed to demonstrate that he is entitled to relief.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing

evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

Usually, when a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

In Cronic, though, the United States Supreme Court identified three scenarios involving the right to counsel where the situation was "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658. Under such circumstances, an irrebuttable presumption of prejudice exists, and the

- 16 -

petitioner need not meet the elements of Strickland to prove ineffective assistance of counsel. Id. at 662. These three scenarios are: (1) situations involving "the complete denial of counsel," where the accused is denied the presence of counsel at "a critical stage" in the proceedings; (2) situations where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) situations where "counsel is available to assist the accused during trial, [but] the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60; see also Berry v. State, 366 S.W.3d 160, 174 (Tenn. Crim. App. 2011). None of these scenarios exist in this case. Thus, the Strickland standard applies to the Petitioner's claim of ineffective assistance of counsel.

In support of his ineffective assistance of counsel claim, the Petitioner argues that lead counsel should have argued that the following statutory mitigating factors applied to his sentences: that he had no significant criminal history; that he committed the crime while under the influence of a mental or emotional disturbance, i.e., being shot at; that the victims were participants in the Petitioner's conduct; that the crimes were committed under circumstances which the Petitioner reasonably believed provided a moral justification for his conduct; and that he was an accomplice to a crime committed by another person and that his participation was relatively minor in comparison. Regarding non-statutory mitigating factors, the Petitioner contends that lead counsel could have argued he cooperated with authorities, showed remorse, and received only one sanction in prison; completed numerous personal growth programs while awaiting trial; had a good reputation in the community and was voted the most popular student in seventh grade; had a minimal criminal history; displayed a lack of intent to harm anyone and did not fire when fired upon; and had a solid employment history. The Petitioner further argues that lead counsel could have argued against the application of certain enhancement factors, including that he was the leader in the commission of the offense. Finally, the Petitioner contends that lead counsel was ineffective for failing to oppose consecutive sentencing and failing to argue that his effective sentence violated constitutional provisions against cruel and unusual punishment.

In addressing the mitigation proof presented at the sentencing hearing, the post-conviction court stated as follows:

> This court has carefully reviewed all of the mitigation entered by the petitioner at the hearing on this petition as possible mitigation, and has also reviewed the mitigation presented at the petitioner's sentencing hearing, contained in the Volume 13 of the Trial Record, and finds no deficient performance by trial counsel or prejudice to the petitioner. Much of the

- 17 -

mitigation prepared for use at the trial in the sentencing phase, if the petitioner had [been] found guilty of the Murder First Degree of Jessica Borner, would have been inadmissible as hearsay in the noncapital sentencing hearing. A prime example would be the power-point presentation created by Glori Shettles, the mitigation specialist, entitled George Franklin Life History. It would not have been admissible. At a sentencing hearing in a capital case, "any such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence." See Tenn. Code Ann. § 39-13-204(c). The jury is to weigh that mitigation against aggravating circumstances found beyond a reasonable doubt, and it is used not to decide what sentence within Range I the petitioner would receive, but rather whether or not it was outweighed beyond a reasonable doubt by the aggravating circumstance or circumstances. In a non-capital sentencing hearing, when the sentencing is done by the trial judge, weighing the enhancement factors, mitigating factors and statutory principles of sentencing, limited by the Tennessee Rules of Evidence, the procedure and proof adduced is much different.

[Lead counsel] put on a good deal of mitigating testimony through the presentence report and the testimony of the petitioner and his mother. Much of the mitigation fell apart under cross-examination, however. The petitioner never worked for the City of Memphis as alleged, for instance, as he had first stated. He was to have started that job, but testified at the hearing on this petition that he never started because he was taken into custody for the murder of Jessica Borner before he could. He had no steady work history, and was in fact a drug dealer, whose last drug deal had caused the shooting death of a three-year-old girl and the shooting of several other people. He had never held a job for more than a few months. His mother testified under cross-examination that she could not recall his ever working, except for a couple of months while in Virginia Beach. He testified to his 17 Certificates that he earned while in prison, but this mitigation paled in comparison to the weight this court placed on his numerous enhancement factors. Any additional mitigation shown in the hearings on the instant petition that [lead counsel] could have put on, such that he was voted most popular student in the seventh grade, that would have been admissible under the stricter evidentiary rules of a non-capital sentencing hearing, would have had no effect on his sentence. This allegation has no merit.

As to consecutive sentencing, the post-conviction court stated:

- 18 -

[The Petitioner argues that] because the petitioner did not fire a shot, and his co-defendants received a concurrent sentence, the petitioner's sentence violated constitutional prohibitions on cruel and unusual punishment, and counsel was ineffective in failing to argue this point. The petitioner's cousin, Leslie Franklin, entered a guilty plea to Murder Second Degree four years before the petitioner's trial and elected to receive an agreed-upon, negotiated sentence of 25 years at 100% service, rather than risk a sentence of death at trial. This court struck the death notice the State had filed against Mack Jones due to his proven intellectual disability. After he rejected his offer of settlement, he was tried by a jury in October of 2004, a year and a half before the petitioner's trial, putting on a defense of "diminished capacity." He was convicted of Murder First Degree and 9 counts of Criminal Attempt: Murder first degree, receiving a life sentence and 9 sentences of 22 years each. This court ordered the sentences served concurrently, finding that a resulting life sentence, for which he would not be eligible for release for 51 years, was "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2). In Gray v. State, 538 S.W.2d 391 (Tenn. 1976), our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses. In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct." Under the circumstances of Mack Jones' life sentence, this court felt that a total of 51 years was lengthy enough to protect the public from further criminal acts by him. He would not have committed these offenses if he had not had a low IQ, had been easily led, and had been induced to commit these acts by the petitioner. This court felt that the 133 year sentence given the petitioner was also justly deserved, and met all of the above statutory criteria. After his resentencing due to Gomez II, he is now serving 21 years at 100% with an additional 81 years to be served at 30% parole eligibility (24.3 years). Even if he earns none of his possible 15% sentence credits, he will be eligible for a parole hearing in 45 years, well before Mack Jones. His sentence is not unconstitutional, and if

- 19 -

his attorney had argued that his resultant consecutive sentences were disproportionate, this court would not have agreed. This allegation is without merit.

Due to the nature of this case, we have taken judicial notice of the record from the Petitioner's direct appeal. Our review of the Petitioner's sentencing hearing shows that the State presented testimony from the four-year-old victim's father and Jessica Borner's mother and brother. The Petitioner's mother testified on his behalf. Moreover, despite lead counsel's claim to the contrary, the Petitioner also testified. During his testimony, the Petitioner identified his certificate of baptism and certificates for courses he had completed while incarcerated, including courses on religion and the Bible, stopping violence, anger management, life skills, drugs and alcohol, and Moral Recognition Therapy. Lead counsel introduced all of the certificates into evidence. At the conclusion of the sentencing hearing, the State argued that the trial court should enhance the Petitioner's sentences based upon his being a leader in the commission of the offense, Jessica Borner's and the four-year-old's being particularly vulnerable due to their ages, the personal injuries and property damage were particularly great, the Petitioner possessed or employed a firearm during the commission of the offenses, he had no hesitation about committing a crime where the risk to human life was high, he willfully inflicted bodily injury on another person, and the crimes were committed under circumstances where the potential for bodily injury was great. The State requested that the trial court sentence the Petitioner to the maximum punishment in the range for each conviction and that the trial court "run a sufficient number" of the sentences consecutively based upon the Petitioner's being a dangerous offender. Lead counsel argued against the enhancement factors, and his argument spanned eight pages of the transcript. He also argued against consecutive sentencing, asserting that the Petitioner was not a dangerous offender because he had been rehabilitated, had accepted responsibility for his actions, and did not have a history of violence. Despite lead counsel's extensive argument, the trial court found that six enhancement factors, but no mitigating factors, applied to the Petitioner's sentences and that he should serve the sentences consecutively as a dangerous offender. We conclude that the Petitioner has failed to show that lead counsel was deficient at sentencing.

Furthermore, this court concluded on direct appeal of the Petitioner's convictions that the trial court properly enhanced the Petitioner's sentences based upon his having three prior misdemeanor convictions but that the trial court erred by applying the other five enhancement factors under Gomez II. George Franklin, W2006-01204-CCA-R3-CD, 2008 WL 4613876, at *9. Accordingly, this court reduced the Petitioner's sentence for the second degree murder conviction from twenty-five to twenty-one years and reduced his sentences for the attempted second degree murder convictions from twelve years to nine years. Id. In considering the Petitioner's claim that the trial court erred by

- 20 -

ordering consecutive sentencing, this court concluded that the trial court properly ordered consecutive sentencing based upon the Petitioner's being a dangerous offender, resulting in a sentence of 102 years. Id. at *10. The post-conviction court, which also presided over the Petitioner's trial and sentencing, stated that despite the mitigating evidence presented at the post-conviction evidentiary hearing, the Petitioner's effective sentence of 102 years was appropriate. Therefore, we conclude that the Petitioner also has failed to demonstrate prejudice.

## B. Brady Violation

The Petitioner contends that the State violated his due process rights by not disclosing Mr. Canard's statement to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963). According to the Petitioner's brief, Mr. Taylor testified at the Petitioner's trial that Mr. Taylor was armed with a nine-millimeter handgun and jumped out of a window in the back of the Rosamond house. However, due to the State's failure to turn over Mr. Canard's statement, the defense did not have any proof until trial that a shooter was in the back of the house with Jessica Borner. The Petitioner contends that Mr. Canard's statement would have given the defense prior knowledge that there was a shooter, other than the codefendants, near where the victim was shot and killed. The defense then could have presented the theory that Mr. Taylor, not the codefendants, shot the victim as he was leaving. The State counters that the Petitioner did not prove the State suppressed the statement and that, in any event, the Petitioner knew Mr. Taylor escaped out the back window before trial because Mr. Taylor gave such testimony at Mack Jones's trial. The State further notes that Ms. Geiser's notes indicate she interviewed Mr. Taylor before trial and that he told her he escaped from the house through a back window. Moreover, news reports about the shooting also provided that Mr. Taylor ran through the house near the victim before exiting. We conclude that the Petitioner is not entitled to relief.

Regarding this issue, the post-conviction court stated as follows:

Exhibit DD to the November 12, 2015, hearing on the instant petition is a statement given by Patryck [Canard], who stated in pertinent part as follows:

A. I was around the corner on Farmville, Tyrone [Taylor] busted thru the door and said he had been shot and asked me would I let his family know where he was, so I went and picked up J. C. on Rosemond and took him on Farmville.
Q. What time was this?
A. Right after I heard the shooting, Tyrone ran into the house

on Farmville.
Q. Did Tyrone say how he had gotten shot?
A. No Sir
Q. Did you ask him?
A. No Sir

Exhibit CC, a Google map of the area, shows that the house on Farmville backed up to the rear of the house at which the shooting occurred. The petitioner alleges that this statement may have been exculpatory, in that it is proof that Tyrone Taylor ran to the rear of the house when the shooting started, exiting the rear of the house, because the house on Farmville was directly behind the house where all of the children were shot. Therefore, the petitioner could theorize that Tyrone Taylor might have been the one who killed Jessica Borner with his gun in the crossfire. He also alleges that this statement was exculpatory for that reason and should have been turned over to the defense. There are several problems with this allegation. First, the trial attorneys' files were destroyed by a flood in their office basement (water standing for many days), and the trial attorney could not say whether or not they had received that statement. The petitioner supposes that as the statement was in the District Attorney's files and not in the files of Inquisitor, Inc., the defense investigator's files, that it must not have been turned over to the defense. This proof is hardly clear and convincing. Secondly, Tyrone Taylor testified in the trial that he jumped out of the back window of the house, so the jury was privy to that information in any event. Taylor described the petitioner's approaching him in the front yard with a gun, and his subsequent actions as a result, as follows:

A. He was, like, "what's up now, bitch?" I'm, like, "Ain't nothing up, Bro. You've got a gun." He was, like, "Talk that shit now." He started shooting at me.
Q. What did you do then?
A. Nothing. I was dodging his bullets. When he struck me in the arm, Leslie and Mack had pulled up their guns and started shooting, too. They started shooting straight in the house, you know what I'm saying. I heard a lot of hollering, so I ran in the house. I get in the house, it was a bloody bath, sir. Everybody was down, kids and everything.
Q. What did you do when you got in the house?
A. I ran to the back of the house. I seen Jessica and a lot of kids in one room. They were still laying there. I ran - -
Q. What was Jessica doing?

- 22 -

A. She was just laying down, sir, laying down in a puddle of blood.

Q. Was she shot?

A. Yes, sir.

Q. Was she in the back part of the house, then? Where was she located in the house?

A. When she got shot, she was in the living room.

Q. Where was she when you saw her?

A. When I saw her, she was in the back room, straight ahead.

Q. What did you do after you saw her when you were running through the house?

A. I panicked, you know what I'm saying. I ain't never seen nothing like that. I panicked and jumped out the window.

Q. So that's the window in the back of the house at 3448 Rosamond?

A. Yes, sir.

Trial Record, Vol. 8, pp. 461-62. He then testified that he went to the neighbors in back of the house, (presumably meeting Mr. [Canard]), bleeding. They had already called the police after hearing the shooting. He later returned to the crime scene and saw Jessica Borner being carried out on a stretcher. Thirdly, the medical examiner testified that Jessica was shot with a high-powered rifle, not a low-powered handgun, which would exclude Tyrone Taylor as the shooter. The lead trial attorney testified at one of the hearings on the instant petition that he could not remember whether or not they were aware of Canard or had ever contacted him. He testified as follows:

> I don't know what talking to these people would have revealed. If it had been helpful I assume we would have used it, but - - you know, you talk to witnesses no telling what they're going to say.
>
> They could say anything from Mr. Taylor was upset or crying to Mr. Taylor was a gang leader. I don't know what they would have said, but it was something that if we had - - if we had - - if we didn't talk to them and we had talked to them if they provided something useful we would have used it.

Transcript of the November 12, 2015 Hearing, p. 48. This court gave the petitioner years during the pendency of this petition to find Mr. [Canard] if

- 23 -

he wished and have him testify at the hearing, if he had anything beneficial to say, but he was never called as a witness. This court cannot say that any Brady violation ever took place. In order to establish a Brady violation, four elements must be shown by the defendant: 1) that the defendant requested the information, 2) that the State suppressed the information; 3) that the information was favorable to the accused; and 4) that the information was material. See State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). In this case it is far from clear that the State suppressed this statement, and this court finds that it is neither favorable to the accused nor material. At a post-conviction hearing, when a defendant presents a witness whom he claims should have testified at trial, the post-conviction court must determine whether such testimony would have been admissible and was material to the defense. Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008). If the post-conviction court determines that the proffered testimony would not have been admissible at trial or that, even if admissible, it would not have materially aided the petitioner's defense at trial, the post-conviction court is justified in finding that trial counsel was not deficient in failing to call that witness at trial. Id. No prejudice or deficient performance has been shown by the petitioner as to this allegation.

In Brady, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In order to establish a Brady claim, a defendant must establish the following:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995).

Evidence is "favorable" if it is deemed to be exculpatory in nature or could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn.

- 24 -

2001). "'[E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness'" falls within the Brady disclosure requirement. State v. Jackson, 444 S.W.3d 554, 593 (Tenn. 2014) (quoting Johnson, 38 S.W.3d at 56-57). The State's duty to disclose extends to all favorable evidence regardless of whether the evidence is admissible at trial. Brady, 373 U.S. at 87. Brady applies to both evidence in the prosecution's file and "any favorable evidence known to others acting on the government's behalf in the case, including the police." Jackson, 444 S.W.3d at 594 (citations omitted). The State's duty to disclose does not extend to information the defendant already possesses or is able to obtain or to information not in the possession of the prosecution or another governmental agency. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Accordingly, a "reasonable probability" of a different result is established when "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678). Materiality requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435. In determining whether the evidence is material, the suppressed evidence must be "considered collectively, not item by item." Id. at 436.

Whether a petitioner is entitled to a new trial based upon a Brady violation "presents a mixed question of law and fact." Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004).

> The lower court's findings of fact, such as whether the defendant requested the information or whether the state withheld the information, are reviewed on appeal de novo with a presumption that the findings are correct unless the evidence preponderates otherwise. The lower court's conclusions of law, however, such as whether the information was favorable or material, are reviewed under a purely de novo standard with no presumption of correctness.

Id.

Turning to the instant case, all of the previously enumerated requirements of Brady must be met in order to show a Brady violation. The post-conviction court accredited lead counsel's testimony that his original case file was destroyed in a flood and that he did not know whether or not Mr. Carnard's statement was disclosed to the defense. Therefore, the court found that the Petitioner failed to show that the State suppressed the statement. The evidence does not preponderate against the finding of the post-conviction court.

The post-conviction court also found that the statement was neither favorable nor material. We agree. Even if the State suppressed Mr. Canard's statement, which supported evidence that Mr. Taylor exited from a back window of the house, Mr. Taylor testified at Mack Jones's trial that he ran inside the house, jumped through a back window, and ran to a neighbor's house. See Mack Tremaine Jones, No. W2005-00014-CCA-R3-CD, 2007 WL 1840798, at *2. Mr. Taylor also said at the Petitioner's trial that he jumped out of the back window. Therefore, the Petitioner had access to the information before and during his trial. Additionally, nothing in Mr. Canard's statement supports the Petitioner's claim that Mr. Taylor had a gun when he went through the house. Although the Petitioner states in his brief that Mr. Taylor testified at the Petitioner's trial that he had a nine-millimeter handgun when he jumped out of the window, our careful review of the trial transcript shows that he never gave such testimony. Both the State and the Petitioner called Mr. Taylor to testify at trial. On cross-examination by lead counsel, Mr. Taylor said, "I wouldn't have a gun, sir." On cross-examination by the State, the prosecutor asked if Mr. Taylor had a gun and if he pointed a pistol at the Petitioner on June 12, 2002, and Mr. Taylor answered both questions in the negative. Lead counsel testified at the evidentiary hearing that Mr. Taylor said he did not have a gun, although lead counsel opined that the jury could not have believed his claim, given his character. In any event, the medical examiner testified in detail about the damage the bullet caused to Jessica Borner's body and stated that the damage had to have been caused by a high-velocity weapon such as a rifle, not a low-velocity weapon such as a nine-millimeter handgun. Therefore, Mr. Canard's statement does not put the whole case in such a different light as to undermine confidence in the verdict. Accordingly, we agree with the post-conviction court that the Petitioner is not entitled to relief on this issue.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

\_

_____
NORMA MCGEE OGLE, JUDGE